## AFFIDAVIT OF SPECIAL AGENT LISA RUDNICKI

I, Lisa Rudnicki, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("AATF"), and have been so employed since February, 1996. In that capacity, I investigate violations of the federal firearms statutes and have participated in many investigations relating to the unlawful possession of firearms and ammunition.

2. Based on my training and experience, I am aware that Title 18, United States Code, Section 922(g)(1) makes it a crime for a person, previously convicted in court of a crime punishable by imprisonment for a term exceeding one year, to possess a firearm in and affecting commerce.

3. I submit this affidavit in support of an application for criminal complaint charging KERRY CHARLOTIN ("CHARLOTIN"), date of birth xx/xx/1989, with Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1).

4. This affidavit is based upon information personally known or provided to me by other agents and members of the Boston Police Department, and a review of the records generated in this investigation and review of documents and court papers. This affidavit does not contain all the facts known to me but rather only those which are sufficient to establish probable cause that CHARLOTIN committed the above-mentioned offense.

### PROBABLE CAUSE

#### May 1, 2019 Incident

5. On May 1, 2019 around 5:23PM in the area of 1186 Blue Hill Avenue in Mattapan, members of the Boston Police Department ("BPD") arrested CHARLOTIN for unlawful possession of a firearm, in violation of Massachusetts General Laws ("MGL") ch. 265 section

1

10(a); unlawful possession of ammunition, in violation of MGL ch. 265 section 10(h)(1); and, carrying a loaded firearm, in violation of MGL ch. 265 section 10(n).

6.      Officers Christopher Kennedy ("Kennedy"), Charles Keller ("Keller") and Peter Lekaditis ("Lekaditis") (collectively "officers") were on patrol in the area of 1212 Blue Hill Avenue due to citizen complaints about public drinking and drug dealing in that general area. Lekaditis was driving, Kennedy was the front seat passenger and Keller was in the back seat. Officers observed two males, one later identified as the defendant, CHARLOTIN, and the other Jabrill ANDREWS ("ANDREWS") walking inbound on the even numbered side of Blue Hill Avenue at Woolson Street. Officers noted both ANDREWS' and CHARLOTIN's calm demeanor as they appeared to be walking towards a nearby liquor store.[1] When both appeared to observe officers' presence, specifically in their unmarked cruiser parked at the end of Goodale Road, both hurried their pace and walked past the liquor store and turned right onto Landor Road, constantly looking back at officers in a nervous manner. Officers saw the two enter the rear private driveway that allows access for business owners along Blue Hill Avenue between Morton Street and Landor Road and were aware that there are numerous "No Trespassing" signs barring unauthorized entry. Throughout this period, ANDREWS, wearing a black jacket, appeared to be walking in front of CHARLOTIN, who was wearing a red jacket and wearing a black backpack on his back.

7.      Officers drove their car onto Blue Hill Avenue and took a right onto Landor and a left into the rear driveway where they had observed CHARLOTIN and ANDREWS enter. The back entrances of the Blue Hill Avenue commercial businesses, that is businesses between Landor and Morton Streets, line this driveway. As officers pulled into the driveway, they observed both men run into a smaller secluded area of the driveway. As they were running, CHARLOTIN was seen

---

[1] The name of this liquor store is known to the government.

with a black backpack still on his back. CHARLOTIN was running behind ANDREWS as both ran away from officers. Officers pulled the cruiser up to the entrance of the secluded area of the driveway and got out of their cruiser in pursuit of the two men. Lekaditis ran in the direction of where he had originally seen CHARLOTIN and ANDREWS. Kennedy and Keller ran around the building in an effort to cut off any potential escape if they were to run back outbound on Blue Hill Avenue. While in pursuit, Lekaditis observed CHARLOTIN in his red jacket near the back door of one of the Blue Hill Avenue businesses. Lekaditis no longer saw ANDREWS nor did he see anyone else other than CHARLOTIN in the back secluded section of the driveway area. When Lekaditis saw CHARLOTIN, he saw a black backpack in the air and CHARLOTIN entering the rear entrance of the business, which officers later learned was a barber shop located at 1186 Blue Hill Avenue. The backpack looked as if it was going to land on the roof right above the rear entrance of the barber shop. When Lekaditis entered the barber shop, in pursuit of ANDREWS and CHARLOTIN, he no longer saw the men. Lekaditis ran out the front door of the barber shop and onto Blue Hill Avenue in continued pursuit. Lekaditis looked up and down Blue Hill Avenue and saw ANDREWS and CHARLOTIN running towards Morton Street, with ANDREWS ahead of CHARLOTIN.

8.  Both CHARLOTIN and ANDREWS ran inbound on Blue Hill Avenue towards Morton Street with Lekaditis following close behind them. Lekaditis caught up to ANDREWS, who had crouched behind a car parked on the side of the street as if to evade detection. ANDREWS was later arrested for trespass.

9.  Lekaditis informed Kennedy and Keller that CHARLOTIN may have fled across Morton Street and into a backyard. Officers went into a rear residential yard on Morton Street[2] while

---

[2] The exact address on Morton Street is known to the government.

broadcasting CHARLOTIN's potential flight path. Other officers in the area set up a perimeter along Frontenac Street in order to prevent CHARLOTIN from any further flight. After searching the area, officers located CHARLOTIN laying down in brush behind a fenced in portion of the Morton Street residential yard and behind a playground on Frontenac Street. CHARLOTIN no longer had a backpack.

10. Officers responded back to the rear of 1186 Blue Hill Avenue, specifically the roof. Lekaditis climbed onto the roof and located the a black backpack consistent with the one officers saw earlier on CHARLOTIN's back and that Lekaditis had seen in the air as CHARLOTIN was running away from him. Inside the backpack, among other things,[3] officers located a loaded firearm. The firearm in the black backpack was a Glock 26, caliber 9mm Luger, semi-automatic pistol with serial number BBTP122. Contained in the detachable magazine in the firearm were nine rounds of 9mm ammunition with one of those rounds in the chamber.

11. Officers arrested CHARLOTIN for charges related to his possession of the loaded firearm in the black backpack. He was *Mirandized* and agreed to an audio and video recorded interview with BPD. During the interview, among other things, CHARLOTIN admitted to wearing a red jacket and denied knowing "the kid in the black jacket" who was also arrested. When confronted about the backpack, he initially denied that he had one and that one was on his back. Later in the interview, BPD confronted him again about the backpack to which he said "If I had a backpack, if I did, I had a book bag." When asked what was in it, he said "School books." When BPD confronted him that there were no schoolbooks in the bag he stated "then it's not my backpack."

12. I have reviewed video surveillance in and around the Blue Hill Avenue/Morton Street area

---

[3] Among the items in the backpack were cell phones and a black plastic bag containing a piece of fruit, either a papaya or mango. Two latent prints from the plastic bag holding the fruit were individualized to ANDREWS.

from May 1, 2019, specifically from inside and outside of a commercial establishment[4] in this area. That video depicts CHARLOTIN with ANDREWS inside and outside the commercial establishment. In various video surveillance footage from the hours and minutes before CHARLOTIN's arrest, CHARLOTIN is wearing a red Northface jacket, grey hooded sweatshirt, dark pants, black and white sneakers and knit cap. CHARLOTIN is also seen carrying a black backpack similar to the one discarded on the roof of the Blue Hill Avenue commercial building when he ran from police.

### Interstate Nexus

13.     The recovered firearm, that is, the Glock Model 26, caliber 9mm Luger, semiautomatic pistol with serial number BBTP122 was manufactured in Austria and imported to Glock, Inc., in Smyrna, Georgia. The Glock was first sold to a Federal Firearms Licensee in Chaplin, South Carolina. It was then sold to a Federal Firearms Licensee in Ohio and onto a legal purchaser in Ohio. I am also aware that the 9mm ammunition contained within the Glock firearm were not manufactured in Massachusetts. Thus, the firearm and ammunition traveled in interstate commerce before they ultimately were recovered in the Mattapan neighborhood of Boston on May 1, 2019.

### CHARLOTIN's Criminal History

14.     I have reviewed CHARLOTIN's criminal history as maintained by the Massachusetts Criminal History Systems Board. It reveals, among other things, CHARLOTIN was previously convicted of Assault with a Dangerous Weapon (to wit: gun) in the West Roxbury Division of the Boston Municipal Court on docket 1706CR0169 on May 17, 2018. He also was previously convicted of larceny from a person in the West Roxbury Division of the Boston Municipal Court on docket 1706CR0074 on May 17, 2018. For each of these two cases, CHARLOTIN received a

---

[4] The name and location of the commercial establishment is known to the government.

split sentence of eighteen months in the House of Correction, with 114 days to serve and the remainder of that sentence was suspended until May 15, 2020. Because CHARLOTIN was sentenced on these two cases to eighteen month house of correction sentences (albeit with a portion of those sentences suspended), it is inferable that he knew his convictions for assault with a dangerous weapon and larceny from a person were for a crime punishable by a term of imprisonment greater than one year.

15. CHARLOTIN was further convicted of larceny from a person, assault and battery and witness intimidation in the Suffolk Superior Court on May 30, 2013 on docket 1284CR10440. On the larceny from a person, he received a guilty sentence of two years committed to the house of correction with five months to serve and the remainder of the sentence suspended for two years. For the assault and battery and witness intimidation charges, he received two years of probation. I know that these charges are punishable by a term of imprisonment exceeding one year. I also know that during a plea colloquy in Suffolk Superior Court it is customary for the prosecutor to outline the maximum possible penalties for the charges to which the defendant is pleading guilty. I also know that because CHARLOTIN received a sentence of two years committed (albeit some of that sentence was suspended), it is reasonably inferable that he knew that the crime for which he was charged was punishable by a term of imprisonment exceeding one year.

16. In light of each of the above listed convictions, CHARLOTIN is prohibited from possessing a firearm and ammunition under Federal Law, specifically, 18 U.S.C. § 922(g)(1).

## CONCLUSION

17. Based on the above, I believe probable cause exists that on May 1, 2019, Kerry CHARLOTIN, knowing that he was previously convicted in a court of a crime punishable by

imprisonment for a term exceeding one year, did knowingly possess in and affecting commerce, a Glock Model 26, caliber 9mm Luger, semiautomatic pistol and nine rounds of 9mm ammunition, in violation of 18 U.S.C. § 922(g)(1).

Signed under the pains and penalties of perjury this 15TH day of August, 2019.

Lisa A Rudnicki
Special Agent Lisa Rudnicki
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me this this 15th day of August, 2019.

Marianne B. Bowler /mj
HON. MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE